# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **TRACY L. BEAMAN-BATES,** | : | |
| | : | **Hon. Joseph H. Rodriguez** |
| **Plaintiff,** | : | |
| | : | **Civil No. 17-5581** |
| **v.** | : | |
| | : | |
| **ACME MARKETS, INC.,** | : | |
| | : | **OPINION** |
| | : | |
| **Defendant.** | : | |

This matter comes before the Court on Motion for Summary Judgment of Defendant ACME Markets, Inc. The Court has considered the written submissions of the parties, as well as the arguments advanced at the hearing in this matter on December 11, 2019.   For the reasons expressed on the record that day, as well as those that follow, Defendants' motion is granted.

## I.    Background

Plaintiff Tracy L. Beaman-Bates ("Beaman-Bates"), who is African American, is an employee of Defendant ACME Markets, Inc. ("ACME").   She claims that she was the victim of a racial slur during one of her shifts, that ACME did not do a sufficient investigation into the incident, and that she was retaliated for complaining about the slur when ACME changed the store that she claims she was assigned to and scheduled her to work at a store geographically distant from her home. The Complaint alleges two counts; Hostile Work Environment (Count I) and Retaliation (Count II), both pursuant to the New Jersey Law Against Discrimination, N.J.S.A. §10:5-1 et seq.

1

The following facts are taken from Plaintiff's Statement of Undisputed Facts and presented in a light most favorable to her. Plaintiff was hired by ACME in 1996 as a Deli Clerk in the Deli Department. Def.'s Ex. A, Pl.'s Dep. at 15.   She has had several positions since that time, including a Meat Wrapper in the Meat Department, a two-year apprenticeship in the Meat Department, and a Journeyman Meat Cutter. Id. at 16-17.

From 2016- 2018, Plaintiff was a floater employee. Def.'s Ex. A, Pl.'s Dep. at 29; Def.'s Ex. B, William's Dep. at 53. The parties agree that "floaters" are assigned in various stores depending on the customer service needs of a store at a particular time. According to Plaintiff scheduling happened as follows: The Meat Specialist would prepare an e-mail to the ACME stores, not the individual floaters, that included the schedules of the floaters. Ex. A, Pl.'s Dep. at 36-38. The floating Meat Cutters would have to call the store to find out their hours for each shift scheduled. Id. Generally, the floaters' schedules for the following week were published on Mondays by listing their names with the assigned store number. Id. at 38, 41. As a result, floaters typically knew their schedule a week in advance. According to Plaintiff, she was most often assigned to the Lenola Road Store. Between December 1, 2015 until the incident on February 13, 2016, Plaintiff claims she worked forty-three (43) out of forty-seven (47) shifts at the Lenola Road location. Def.'s Ex. N, Pl.'s Schedules.

Plaintiff complains that she was the victim on a racial slur on February 13, 2016 and that ACME failed to investigate the incident and ultimately retaliated against her by assigning her to stores geographically far from her home because of her complaint about the slur. On February 13, 2016 while working at the Lenola Road store, Plaintiff heard

2

someone enter the room. When she turned around, she saw employees Albano and Tarik Kilic entering the meat room. Def.'s Ex. A, Pl.'s Dep. at 54. Plaintiff saw and heard "Mike [Albano] say to Tarik [Kilic], 'That's my nigger.'" Def.'s Ex. A, Pl.'s Dep. at 54, 97. At the time of this utterance, Albano was approximately fifteen feet away from Plaintiff, but was walking toward Plaintiff. Id. at 157.   Plaintiff then asked Albano what he said. According to Plaintiff, Albano looked her in the eyes, cocked his head to the left, and said "[t]hat's my nigger." Id. at 157-158.   Plaintiff alleges that Albano used the term "nigger" in retaliation because she had reported him the day before for refusing to wrap the meat she sliced. Id.; Def.'s Ex. L.

There are only four witnesses to Albano's racial remark: Albano himself, Plaintiff, Crouse, and Kilic. Id.; Def.'s Ex. A, Pl.'s Dep. at 157-158. Except for Plaintiff, the other witnesses are Caucasian. Def.'s Ex. A, Pl.'s Dep. at 158; Def.'s Ex. C, Hughes Dep. at 39; Def.'s Ex C, Hughes' Dep. at 56. Plaintiff claims that she and Albano were sent home after she reported the incident to ACME District Manager, Hughes. Plaintiff was unsure if Albano was paid; Hughes testified that he did not know but surmised that the decision "was basically up to [. . . ] the union[.]" Ex. C, Hughes' Dep. at 72. The record reflects that Albano was not paid. Ex. A, Pl.'s Dep. at 66-68; Ex. C, Hughes Dep. at 75-76. While Plaintiff claims she was sent home, Hughes testified that the decision to let Plaintiff go home was mutual. Id. at 59. Plaintiff disagrees: "I did not tell Kevin that I wanted to leave. My daughter's birthday was the next day. I needed to -- and I have a mortgage. I did not want to lose pay. I distinctly told him that I did not want to leave.... Kevin [Hughes] told me to go home..." Ex. A, Pl.'s Dep. at p. 64. Hughes did not know whether Plaintiff was compensated for the time she missed after being sent home. Ex. C, Hughes'

Dep. at 74. The record reflects that Plaintiff was paid for her full shift. Ex. A, Pl.'s Dep. at 65; Ex. C, Hughes Dep. at 73; Ex. D, Crouse Dep. at 40.

In general terms, Plaintiff complains that ACME's investigation into the February 13, 2016 incident was insufficient and ultimately resulted in retaliatory action towards her.   She also claims that ACME did not take her complaint seriously because ACME stopped scheduling Plaintiff at the Lenola Road location but kept Albano at that location. This resulted in an extreme hardship for her because she has two autistic teenage children (twins) who require supervision and cannot safely be left home alone. Ex. A, Pl.'s Dep. at 135, 160, 161, 163.   According to Plaintiff, ACME is aware of her family circumstances and exploited that fact by the reassignment to different ACME locations as reprisal for complaining against Albano. Id. at 163, 184.

Plaintiff claims that prior to the February 13, 2016 incident, she was scheduled to work at the Lenola Road store on February 15, 2016. Ex. A, Pl.'s Dep. at 73, 77; Def.'s Ex. N, Pl.'s Schedules; Ex. F, ACME Current Store List.   However, after the incident, she claims her schedule was changed to work at the Gloucester Township store on February 15, 2016. Def.'s Ex. N, Pl.'s Schedules; Ex. F, ACME Current Store List.   ACME produced Plaintiff's schedules, which illustrate that Plaintiff was scheduled to work in two separate stores on February 15, 2016 for the same shift from 8:30 to 17:00 (5:00 pm.) Def.'s Ex. N, Pl.'s Schedules; Ex. F, ACME Current Store List.   Plaintiff ultimately worked at the Gloucester Township store on February 15, 2016. Def.'s Ex. O, Pl.'s Time Punch Records; Ex. F, ACME Current Store List. According to Plaintiff, she "was no longer allowed to go into the Lenola store[]" after the incident. Def.'s Ex. A, Pl.'s Dep. at 154.

Against this backdrop, the Court considers Plaintiff's claims under the NJLAD for hostile working environment and retaliation.

## II.   **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Such a showing must be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).   A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, will fail to preclude the entry of summary judgment. Id.

In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and must provide that party the benefit of all reasonable inferences. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). Any such inferences "must flow directly from admissible evidence[,]" because "'an inference based upon [ ] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12

5

(3d Cir. 1990) (citing <u>Anderson</u>, 477 U.S. at 255)).

Accordingly, the moving party initially has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u>; <u>Maidenbaum v. Bally's Park Place, Inc.</u>, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Again, to withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Andersen</u>, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" <u>Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs</u>, 982 F.2d 884, 890 (3d Cir. 1992) (quoting <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 500 (3d Cir. 1991)).

> Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

<u>Celotex</u>, 477 U.S. at 322. The movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); <u>accord</u> Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. Credibility determinations are the province of the factfinder. <u>Big Apple BMW, Inc. v. BMW of N.</u>

Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.   **Discussion**

Analysis of claims made pursuant to the NJLAD generally follow the analysis of Title VII claims.   Schurr v. Resorts Int'l Hotel, Inc., 196 F.3d 486, 498 (3d Cir. 1999). Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e−2(a); Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).   Title VII also prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII] . . . , or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]" 42 U.S.C. § 2000e−3(a). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must establish the following: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."   Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995).

To establish a hostile work environment claim under the LAD, a plaintiff "must demonstrate that the defendant's conduct (1) would not have occurred but for the employee's race; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [person of the same protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive."   Taylor v. Metzger, 706 A.2d 685, 688-89 (N.J. 1998) (quotations omitted).   The New Jersey

7

Supreme Court requires a cumulative analysis of the incidents comprising an alleged

hostile work environment. See Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 455 (N.J.

1993).  "[A]n employer will be held vicariously liable in situations where it delegates

authority to control a work environment to a supervisor, and the supervisor abuses that

authority, or where sexual harassment is foreseeable and the employer is negligent in

having in place or enforcing anti-harassment policies, or where the employer intended

for or gave apparent authorization to the harassing conduct."   Smith v. Exxon-Mobil

Corp., 374 F. Supp. 2d 406, 421 (D.N.J. 2005).


## IV.   **Analysis**

### A. **Retaliation**

The parties agree that there are no genuine issues of material facts related to the first

element of the *prima facie* case for retailiation; namely that Plaintiff engaged in

protected activity when she complained about the racial slur.   ACME argues that there

was no adversarial action taken against Plaintiff because her subsequent working

assignments at different stores was part of her job description.   Moreover, even if

Plaintiff could demonstrate that the assignments in stores geographically distant from

the Lenola Road store constitutes an adversarial employment action, because Plaintiff

was assigned to those stores before her complaint about the racial slur, she cannot

demonstrate a material issue of fact demonstrating a causal connection between the

complaint and Plaintiff's assignment to other stores.

Plaintiff testified that the Lenola Road store is approximately fifteen (15) minutes

from her house and was a convenient placement because she is the mother of special

needs twins. (Ex. A, Pl.'s Dep. at 35-36, 82.)   Plaintiff further testifies that her scheduling consisted primarily of shifts at the Lenola Road store leading up to her complaint.   Then, once she complained, she was scheduled to work in the Logan Township store, which is almost an hour away from her home and that she has not been scheduled at the Lenola Road store as of the date of her deposition. . (Ex. A, Pl.'s Dep. at 158-159.) (Ex. A, Pl.'s Dep. at 82.)

Plaintiff avers that the inconvenient geographical relocation of her assignments is in retaliation for her complaint against Albano, who remains assigned to the Lenola Road store.   Plaintiff's suppositions and speculation find no support in the record and are insufficient to create a genuine issue of material fact on the retaliation claim.   The record evidence demonstrates, through ACME's records, Plaintiff's own testimony, and Plaintiff's counsel acknowledgment at oral argument, that Plaintiff's schedule for the weeks following her February 13, 2016 complaint about the racial slur were published on February 12, 2016, the day before the incident. (SUMF at ¶¶ 74-77.) The schedule included her assignment for the weeks of February 14, 2016 through February 20, 2016.

Indeed, Plaintiff acknowledged this fact during her deposition. "I had already had my schedule for the following week. . . .   I had had my schedule, I received my schedule Friday [for] the following week.   So, when he had said the N-word on Saturday, I knew that I was going, my schedule, if that's your question." (SUMF at ¶ 80.)   The record demonstrates that Plaintiff worked at the Gloucester Township store on Monday, February 15, 2016.   (SUMF at ¶ 82.) Thus, the assignment outside of the Lenola Road store cannot be characterized as adversarial because it was made prior to Plaintiff's complaint.

9

In addition, Plaintiff's claim that she was always stationed at the Lenola Road store prior to the incident lacks support in the record. While it is true that for the two months prior to the incident Plaintiff was largely scheduled to work at the Lenola Road store, the record reflects that on February 9, 2016, four days prior to the incident, Plaintiff worked in the Maple Shade store. Wolcott Decl. at ¶ 5.   In addition, between October 2014 through March 2015, she worked almost exclusively in the Audubon, New Jersey store.   Wolcott Decl. at ¶ 6; SUMF at ¶¶ 8-9.   The record also reflects that there were stretches of time that Plaintiff remained in a single store location, but Plaintiff's claim that her only store was Lenola Road does not find support in the record. (See, generally Ex. N.

Finally, Plaintiff's claim that she has not worked at the Lenola Road store since the incident is belied by the fact that she was assigned to and worked in the Lenola Road store two weeks after the incident, from February 24, 2016 through February 27, 2016. SUMF at ¶¶ 78-79.   Thus, the very next schedule that ACME created after the February 13, 2016 incident had Plaintiff assigned to work at the Lenola Road store.   (SUMF at ¶ 79).   Plaintiff's schedule for February 21-27, 2017 was posted on Friday, February 19, 2016.

Plaintiff's schedule for her time immediately following the incident was created and published before both the incident and her complaint and, therefore, is not evidence of retaliatory conduct.   Moreover, the first schedule created following the incident and complaint assigned Plaintiff to the Lenola Road store in shifts that prevented interaction with Albano.   SUMF at ¶¶ 74-77, 79-80.   As a result, Plaintiff's allegations regarding the use of ACME's scheduling to retaliate against her is not only unsupported, but also

10

contradicted by record evidence that Plaintiff herself concedes is true.    There is no evidence that Plaintiff's assignment to a store other than Lenola is an adverse employment action.    Even if those assignments could be construed as an adverse employment action, there is no evidence of a causal connection between Plaintiff's assignment to the Gloucester/Logan Township store and her complaint because the assignment happened a day before the complaint was lodged.    As a result, Plaintiff cannot show the existence of a genuine issue of fact on the issue of retaliation and summary judgment will be granted on Count II. <u>Baraka v. McGreevey</u>, 481 F.3d 187, 211 (3d Cir. 2007) (holding that a court is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations"); <u>see also</u> <u>Miller v. Pfizer, Inc.</u>, 2011 WL 3273620, at *4 (D.N.J. July 28, 2011) (granting summary judgment for defendant and holding that regardless of plaintiff's conclusory statements, plaintiff "neglects to point to a scintilla of evidence to support this proposition and points to nothing in the record that would substantiate his assertions," and these "unsupported contentions are insufficient to defeat a motion for summary judgment").

## B. <u>Hostile Working Environment</u>

In Count I, Plaintiff claims that she was subjected to a hostile working environment because the racial slur uttered by Albano on February 13, 2016 is singular evidence of a severe and/or pervasive working environment.    Because ACME failed to take appropriate steps to address her complaint and conduct an adequate investigation, Plaintiff claims they are vicariously liable even though Albano is not a manager. The Court will address the issues in turn.

Title VII is not violated by "[m]ere utterance of an ... epithet which engenders

offensive feelings in an employee" or by mere "discourtesy or rudeness," unless it is so severe or pervasive as to constitute an objective change in the conditions of employment. See Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L.Ed.2d 662 (1998) (citations omitted).   In determining the existence of a hostile environment, courts look at the totality of all the circumstances including the frequency of the conduct, the severity of the conduct, whether it is physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interferes with an employee's work performance. Faragher, 118 S. Ct. at 2283.

The employee's perception of a hostile environment must be subjectively felt and objectively reasonable. Id.   In general terms, "[f]or racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments." Schwapp v. Town of Avon, 118 F.3d 106, 110–11(2d Cir. 1997); Al-Salem v. Bucks Cty. Water & Sewer Auth., No. CIV. A. 97-6843, 1999 WL 167729, at *5 (E.D. Pa. Mar. 25, 1999).

Plaintiff testified that the incident on February 13, 2016 was the sole basis for her claim of hostile working environment. The parties submit evidence suggesting that the context or phraseology of the use of the word "nigger" or "nigga" is important, in an apparent effort to make a distinction between a racial barb and an slang version of the word that some use to refer to a friend. On this record, the Court will not parse the language and finds that the record demonstrates that a discriminatory and racially offensive word was uttered by Albano.

Next, the parties disagree on whether Albano directed his utterance to someone

12

other than Plaintiff.   Albano claims that he used the word to refer to Kilic, who is white, in a friendly manner.   But when Plaintiff, who apparently came into the room and then overheard the word, asked Albano to repeat what he had just said, he did, in response to her question, direct the language to her.   Plaintiff, however, claims that Albano directed his first utterance of the word at her, and then repeated it with discriminatory intent when she asked what he had said.   There is a factual dispute as to whether the comment was directed at Plaintiff as an instance of intentional discrimination, but it is not material because of the employment status of Albano as a non-manager. See Anderson, 477 U.S. at 248 (Disputes over unnecessary facts fail to preclude the entry of summary judgment.)

The single incident at issue is highly offensive and racially discriminatory. Under certain circumstances, a single utterance of a racial epithet can be deemed sufficiently severe and pervasive to create a hostile work environment. Metzger, 152 N.J. at 490. Both the connotation of the utterance and the status of the person making the remark are considered for purposes of demonstrating that a single incident is sufficient to create a hostile working environment. Id. at 152 N.J. at 503, 706 A.2d at 691.

The LAD is not a "general civility code…. [D]iscourtesy or rudeness should not be confused with racial harassment," and "a lack of racial sensitivity does not, alone, amount to actionable harassment." Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 860 A.2d 945, 955 (2004) (quoting Heitzman v. Monmouth County, 321 N.J. Super. 133, 728 A.2d 297, 304 (1999)).   The utterance in this case goes beyond rudeness and a "lack of racial sensitivity." Id.   There is a question of fact related to whether Albano directed the statements to Plaintiff or used them is a racially insensitive manner in

13

addressing his co-worker, who is not African American.   That question of fact, however, is not determinative in this case because, under the "totality of circumstances[,]" the conduct at issue, while highly offensive, is insufficient to create a hostile working environment. Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (considering Title VII and LAD claim); Metzger, 706 A.2d at 690.

First, there is no evidence offered to establish that Albano's conduct interfered with Plaintiff's work performance or ability to work, as Plaintiff continues her employment with ACME at the present, was promoted and is now permanently assigned to a single store. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993). Second, the remark in this case was uttered by a non-manager and is alleged as a single isolated incident that was immediately addressed. Unlike the utterance in Metzger, which the New Jersey Supreme Court found "was exacerbated by the fact that it was uttered by a supervisor or superior officer[,]" Albano is "an ordinary co-worker of plaintiff[.]" Metzger, 152 N.J. at 503, 706 A.2d at 691 (1998).

In addition, there is no evidence in the record to establish that Albano's discriminatory comment, as a non-manager employee, triggers *respondeat superior* liability. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996). In Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009), the Third Circuit held that "employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Id. (citing Weston v. Pennsylvania, 251 F.3d 420, 427 (3d Cir. 2001, abrogated in part on other grounds by, Burlington N. & Santa Fe Railway Co.

14

v. White, 548 U.S. 53, 67 (2006)).   The test is whether "an employer knew or should have known about workplace [ ] harassment if management-level employees had actual or constructive knowledge about the existence of a [ ] hostile work environment." Id. (internal quotation marks and emphasis omitted). In addition, courts measure whether "[a]n employer's remedial action is adequate if it is reasonably calculated to prevent further harassment." Id. at 110.

Here, ACME had a policy that Plaintiff availed herself of and the record reflects that ACME took steps to ensure that the incident was not repeated; Plaintiff and Albano were not schedule to work together in the future and Albano was suspended for the day without pay.   ACME maintains policies prohibiting discrimination and harassment, including on the basis of race, which address equal employment opportunity and harassment and provide guidance on how to seek redress through the corporate structure and by way of a hotline. ACME Associate Handbook, Ex. B, Williams Dep. at 11; Ex. I.   In addition, ACME has a "Courtesy, Dignity, and Respect policy" that outlines "steps to take if you feel you are being treated inappropriately[.]" Id.; Ex. B, Williams Dep. at 11-13; Ex. A, Pl.'s Dep. at 149.   The record reflects that all employees, including Plaintiff, are aware of, have access to, and receive training on the contents of ACME's Courtesy, Dignity, and Respect policy. Ex. B, Williams Dep. at 11-14; Ex. A, Pl.'s Dep. at 18, 149.   ACME also displays posters detailing instructions to report inappropriate conduct to a third-party toll-free Associate Hotline. Ex. B, Williams Dep. at 17; Ex. A, Pl.'s Dep. at 19-20.[1]

---

1 Plaintiff generally states in opposition and in her statement of undisputed facts that the policies detailed belong to Albertsons, not ACME.   There is no evidence in the record to suggests that the policies of Albertsons, ACME's

According to Acting Store Director Hughes, immediately after Plaintiff complained to him regarding Albano's statement, he began investigating. Ex. C, Hughes Dep. at 37-39. Hughes called Plaintiff's Union Representative, Mr. Crouse.   Hughes, Crouse and Plaintiff sat together as Plaintiff detailed the incident. Ex. A, Pl.'s Dep. at 65; Ex. D, Crouse Dep. at 23-24; Ex. C, Hughes Dep. at 47-49.

According to Hughes, he then spoke to Albano and reported his findings to the District Manager.   It was decided that Albano would be required to undergo counseling, he would also receive an "oral, written warning" and be suspending for the day without pay. Id. at 58-59, 65, 71; Ex. H, Albano Written Warning. Hughes called this discipline scheme "progressive discipline[.]" Although Plaintiff was sent home from her shift after her meeting with Hughes, she received pay for the entire shift. Ex. A, Pl.'s Dep. at 65; Ex. C, Hughes Dep. at 73; Ex. D, Crouse Dep. at 40. Hughes testifies, and Plaintiff agreed, that Hughes called her later in the day to make sure she was feeling better and to let her now that Albano was suspended for the day. Ex. A, Pl.'s Dep. at 66-68; Ex. C, Hughes Dep. at 75-76. ACME details several steps Hughes took to alert Management about the incident and the nature of the discipline. See Ex. K, 2-14-16 Hughes email; Ex. E, Brooks Dep. at 6.

Plaintiff does not offer any evidence to suggest that ACME did not take steps to address the incident. Rather, Plaintiff alleges that the investigation and discipline did

---

parent Company, are not those of ACME. Plaintiff's allegation, in this regard, is merely conjecture because she fails to provide any citation to the record in support of these assertions. See Gaviria v. Columbus Bakery, Inc., 2013 WL 6008495, *1 n.1 (D.N.J. Nov. 12, 2013) ("As Defendants have failed to provide such citations to the record in support of their disagreement, many of Plaintiff's facts are deemed undisputed for purposes of this summary judgment motion."); Friedman v. Bank of Am., N.A., 2012 WL 1019220, *6 n.2 (D.N.J. Mar. 26, 2012) ("[T]he Court will consider any statement of fact which was not denied by the Plaintiffs with a citation to the record as undisputed for the purposes of this motion for summary judgment.").

not go far enough. As detailed <u>supra.</u> in the Retaliation analysis, Plaintiff and Albano were not scheduled to work together following the incident. When asked on the record during oral argument what else ACME should have done to address the situation, counsel for Plaintiff could not identify an additional step, but argues that Albano should have been removed from the store under a zero-tolerance policy. The fact that Albano remained employed, according to Plaintiff, undermines the legitimacy of the investigation and exposes ACME to liability.   The Court disagrees.

Under NJLAD, "an employer's liability for its own negligence in failing to take effective remedial measures [is] a form of direct liability in addition to vicarious liability." <u>Payton v N.J. Turnpike Auth.</u>, 148 N.J. 524, 536, 691 A.2d 321 (citing <u>Lehmann</u>, 132 N.J. at 623, 626 A.2d 445). Vicarious liability attaches where an employer fails to take effective remedial measures when confronting a complaint for harassment by a non-managerial employee. <u>Payton</u>, 148 N.J. at 536, 691 A.2d 321. "Effective measures are those 'reasonably calculated to end the harassment.'" <u>Id.</u> at 537, 691 A.2d 321 (quoting <u>Lehmann</u>, 132 N.J. at 623, 626 A.2d 445).

In evaluating the employer's response, courts also consider the timeliness of the investigation as evidence of whether the response is effective. "Numerous federal courts have adopted this position as well. Federal jurisprudence in this area is particularly relevant because the LAD draws significantly from federal antidiscrimination law." <u>Id.</u> at 538, 691 A.2d 321 (internal citations omitted). The New Jersey Supreme Court cautions that "a remedial scheme that reaches the correct result through a process that is unduly prolonged or that unnecessarily and unreasonably leaves the employee exposed to continued hostility in the workplace is an ineffective remedial scheme. Such a process,

17

in reality, indirectly punishes employees with the temerity to complain about …

harassment and cannot constitute 'effective' remediation." Id.

None of the concerns identified by the New Jersey Supreme Court that could

trigger vicarious liability against ACME are present.   There is no evidence offered by

Plaintiff to create a genuine issue of material fact as to whether ACME had a policy,

Plaintiff took advantage of the policy, and ACME took steps to ensure that the

complained of harassment ended that same day. As detailed above, the record reflects

that Plaintiff's complaint was addressed immediately (the same day), the harasser was

disciplined, and ACME ensured that Plaintiff and Albano did not work together.   While

Plaintiff may believe the incident merited a stronger disciplinary outcome for Albano,

ACME addressed the issue and ended the possibility for future harassment by Albano by

manipulating the scheduling. Plaintiff's claims that the new schedule punished her

because it caused her to work outside of the store she preferred as punishment is belied

by the record, as set forth in the Court's analysis of Plaintiff's retaliation claim. And the

record reflects that Plaintiff never suffered a lull in scheduling and continues at ACME

to this day in a permanent position (a promotion from her floater position).

Taking the evidence in the light most favorable to Plaintiff, the Court finds that a

rational juror could not conclude that ACME's investigation and method of discipline

were inadequate or not reasonably calculated to end the harassment. Summary

judgment will be granted in favor of ACME.

## V.   **Conclusion**

For the reasons set forth above, summary judgment will be granted as to Count I

and Count II on Plaintiff's claims of hostile working environment and retaliation under the NJLAD.

An appropriate Order shall issue.

Dated: June 17, 2020

s/ Joseph H. Rodriguez
Hon. Joseph H. Rodriguez,
United States District Court

19